Norman T. Vorse et al., Appellants, v. Frank W. Vorse, Appellee.

**WILLS:** Construction—Bequests. Under a will bequeathing the entire estate to testator's two sons, and providing for the payment by the two sons of the mortgage and' for repairs on homestead owned by testator's wife, and for good and reasonable support as long as she remained his widow, such charges were the equivalent of a bequest to her, and sums and expenses paid by one of the sons for his mother's care, support, nursing, and necessities, were a payment of the indebtedness which he impliedly assumed by the acceptance of said devise in his favor, and created no indebtedness on her part.

**GIFTS:** Evidence. Evidence reviewed, and held insufficient to show that a mother had made a gift of property to her son.

**TRUSTS:** Establishment—Evidence. Evidence reviewed, and held insufficient to show that property received by a son from his mother was for a consideration, or that the same was received by him without fraud or undue influence on his part.

**DEEDS:** Validity—Want of Valuable Consideration. Mere want of valuable consideration is insufficient to set aside deed to son from his mother, in action brought by her heirs after her death.

**DEEDS:** Validity — Presumptions — Evidence — Burden of Proof. Where the grantee in deeds from his mother was her only liv-

ing child, and her sole agent and confidential adviser, and one one to whom she looked for help and direction, she being advanced in years, physically disabled, and her mental powers being weakened, a presumption of fraud or undue influence arose, and the burden rested upon him to show his good faith in taking conveyances from her.

WITNESSES: Competency—Transaction with Deceased. A son was incompetent to testify under the statute as to transactions had by him with his deceased mother.

DEEDS: Validity—Undue Influence—Evidence. Evidence reviewed, and held to confirm and strengthen the presumption that conveyances to a son by his mother were the result of undue influence on his part.

*Appeal from Polk District Court.*—W. H. McHENRY, Judge.

MARCH 21, 1919.

REHEARING DENIED JULY 7, 1919.

SUIT in equity to establish a trust, and for an accounting. The petition was dismissed, and plaintiffs appeal. The facts, so far as material, are sufficiently stated in the opinion.—*Reversed and remanded.*

*W. E. Miller,* for appellants.

*Halloran & Starkey,* for appellee.

WEAVER, J.—Norman T. Vorse, the common ancestor of the parties to this suit, died testate, February 10, 1877, leaving him surviving his wife, Elizabeth, and two sons, Charles S. and Frank W., his only heirs at law. The son Charles S. died intestate in the year 1890, leaving his wife, Augusta T., and three children, Norman T., Charles S., and Florence (now Miller), his only heirs at law. The mother, Elizabeth, did not marry again, and died testate, January 14, 1915, at the age of 84 years, leaving as her only heirs at law her son Frank T. and the above-named children of her deceased son, Charles S. The will of Norman T. Vorse,

which was duly probated, provided for the disposition of his estate as follows:

"I will and bequeath my entire estate to my two sons, Charles S. Vorse and Frank W. Vorse, each to share equal in the said estate after all the debts are paid and I wish the debts to all be paid as soon as it can be done without sacrificing property. There is an indebtedness secured by mortgage on residence which I wish to be paid as soon as it can be done. Said payment to be made out of the funds of the estate though said residence is the property of my wife, E. M. Vorse. And I desire that the taxes on said residence and all the necessary repairs on said residence be kept paid and a good and reasonable support to my wife so long as she remains my widow."

This action is brought by the widow and heirs of Charles S. Vorse, deceased, to charge the defendant, as trustee of Elizabeth Vorse, deceased, and to require an accounting at his hands for a large amount of property, money, credits, rents, and profits, alleged to have been obtained by him from his said mother without consideration, and by actual or constructive fraud. They also allege that Elizabeth Vorse executed and left a last will and testament, devising to the plaintiffs the one half of her entire estate, but that such will has been sequestrated or withheld from probate by the act of the defendant, in furtherance of the fraud and control of her property.

The defendant denies all of plaintiffs' allegations of fraud, admits that he received some part of the property, moneys, credits, rents, and profits belonging to his mother, but says that such gift or transfer was, in every case, made by her of her own volition and good will, without any fraud or undue influence on his part. He also pleads the statute of limitations.

Upon trial, of the issues thus joined, the court found for the defendant, dismissed the bill; and plaintiffs appeal.

I.   Were the property and estate of Elizabeth Vorse transferred to defendant without valuable consideration?

It will be seen from the terms of the will that, while Norman T. Vorse devised his entire estate to his two sons, they were made to take it charged with liability for the payment of the mortgage on the homestead owned by his widow, and the duty of furnishing her a "good and reasonable support" during her widowhood.   There is no very explicit showing of either the aggregate or net amount of the estate, but defendant admits, in a broadly general way, that the portion received by him was worth somewhere from $40,000 to $80,000.

It appears that Charles was the active executor in the settlement of the estate, and, up to the time of his own death, it is probable that the mother's dealings with reference to the property were largely had with him.   In the meantime, the administration of the estate was amicably accomplished and closed, each of the sons acknowledging receipt of his equal share therein.   There is very little evidence of the details of transactions between mother and sons prior to the death of Charles, except a showing that, of the insurance received by her upon the life of her late husband, she lent $5,000 to each of the two sons, taking their several promissory notes therefor.   These notes figure somewhat prominently in the later history of this case.   It also appears that, during this period, the homestead property of the widow, mentioned in the will, was sold or exchanged for other real estate, title to which was taken in her name. It does not appear that the mortgage debt upon the homestead, payment of which was charged upon her husband's estate in the hands of her sons, was ever paid by them, and we think it must be assumed that it was not so paid.

Immediately after the death of Charles, defendant took charge of his mother's business and property affairs, and continued in that relation during the remainder of her life.

She never had or employed any other agent or representative, attorney or counsel, with reference to her business or property during that period. In that time she acquired, or at least held, the legal title to a very considerable number of lots or tracts of land in the city of Des Moines, some of which were conveyed to her by the defendant, without any valuable consideration therefor.

It is the plea of the defendant, and he testifies, that, of the some 30 different lots and tracts of land, title to which was held by his mother and later conveyed to him, about 25 were so taken and held by her at his request, in trust for his benefit, and that she never had any beneficial interest therein. Of this trust there is no evidence in the title papers or record, and the sole proof of its existence is in the testimony given by the defendant in his own behalf.

Concerning the other property, concededly held by her in her own right and conveyed to the defendant, it is his claim and testimony that she conveyed it to him freely and voluntarily, without suggestion or influence on his part. He admits, however, that she conveyed to him certain lots for the expressed consideration of $1,800, for which he promised to convey to her six lots in a tract of land formerly owned by her husband, which, "for sentimental reasons," she desired to hold; but that he had never, in fact, made such conveyance, simply because she did not call for or demand it during her lifetime. He also admits that included in these conveyances to him was another tract, of the value of at least $7,500, the title to which he still holds, and that still other lots so conveyed to him he has sold and disposed of. During the same period, he collected and received rents and profits upon the property owned by his mother, to the amount of several hundred dollars per year, but says that, at the end of each 'year, he had a settlement of some kind with her, and for the balances or remainders found due her, he gave her his promissory notes. These notes were never

paid, but, according to his testimony, were voluntarily surrendered or destroyed by her. She also assigned to him a mortgage, securing a debt of $1,300, concerning which he can give no explanation, beyond saying that he never got anything out of it, and that the debt must have been paid to her. In the year 1909, according to his story, she surrendered to him, without payment, the note given her by him for the loan of $5,000.

In the year 1910, the mother received a severe physical injury, and was taken to a hospital for treatment. At this time, all the property formerly owned or held by her had been transferred to the defendant, except an interest which she owned in a coal mining lease in Pennsylvania, which was yielding her an income of from $500 to about $1,500 per year. Shortly after such injury, and about the time she was returned from the hospital to the home of the defendant, she executed an assignment, prepared by the defendant, to himself, for this last remnant of her estate, without valuable consideration.

During all the period from 1890 to the death of Elizabeth Vorse, in 1915, defendant seems to have dealt with her on the theory that she was chargeable with all the expenses incurred for her care and support, in sickness and in health; and, in so far as any such charge or expense was paid by him, it was deducted from the proceeds or income derived by him from her property. Indeed, he suggests the idea that his father's will imposed upon the estate devised to him and his brother no other burden than the maintenance of the homestead in repair—a theory so untenable as not to be open to argument.

Assuming, as we must, that the mother did waive her statutory rights, and was content to accept the provision made by her husband in her behalf, the effect of that provi-

sion was the legal equivalent of a bequest
**1. WILLS:** to her of the amount of the mortgage in-
**construction:**
**bequests.** debtedness on her homestead property, and
of whatever amount was necessary to main-
tain such property in repair and pay accruing taxes there-
on, and to provide for the widow a good and reasonable
support. It necessarily follows that whatever this woman
may have received from the defendant by way of providing
for her care or support, or for the expense, if any, incurred
for attendance and nursing in sickness, or for other neces-
sities of life, created no indebtedness on her part, and was,
at most, the payment of indebtedness which defendant
impliedly assumed and agreed to pay, by his acceptance of
the devise in his favor, made subject to such duty on his
part.

There was also an attempt made on the trial to show,
by the defendant's own testimony, that the conveyance to
him of the more valuable piece of property owned by his
mother was in pursuance of his agreement
**2. GIFTS:** to provide for her a room in his own house.
**evidence.**
He further explains it as being induced by
a desire on her part to compensate him for a disadvantage
suffered or discrimination made against him in the division
of the father's estate between himself and Charles. As these
explanations rest wholly upon the testimony of the defend-
ant himself, given over objections to his competency as a
witness, it is at least very doubtful whether they are enti-
tled to any consideration; but even if such objection be un-
available to the plaintiff, the story, when analyzed, is not
suggestive of any intrinsic merit.

So far as the division of the father's estate is concerned,
the brothers united in vouching to the probate court for its
satisfactory character. It may be there was some conflict
of preferences as to some of the items, as there is quite like-
ly to be in every such transaction, but there is no evidence

of any serious disagreement, and none whatever that the share or part taken by Charles was of any greater value than that taken by the defendant. The alleged promise or agreement by the mother was made in 1899, at a time, as we shall later see, when she had already made a will dividing her estate with entire equality between the defendant and the children of Charles. Had she then been laboring under the impression that Charles had obtained an advantage over the defendant in the division of their father's estate, and had then been desirous of "evening it up" between them, as the defendant says, it is passing strange that she should not have recognized such situation, and applied the remedy in making her will. No hint of this claim is contained in the pleadings, and it is difficult to avoid the conclusion that the existence of this consideration for the deed is an afterthought.

The other phase of the explanation has hardly less peculiar features. The deed by which this particular property was conveyed to the defendant bears date in 1899; yet it was withheld from record for 15 years, and defendant continued to credit his mother with its rental income and charge her with the expenses pertaining to the property during most, if not all, the remainder of her life. He says that, at the date of the deed, he was building a new residence, and it was with reference to this building that he promised to add thereto or include therein a room for his mother, and she, in turn, promised to deed him the other property. But notwithstanding that this room was added to the house for her at her request and according to her own plan, yet it so happened that his wife's mother, also an old lady, came to live with him about the same time, and he says, "I told my mother that Mrs. Bates would have to live with us until she died; and when she died, mother could come and live with us;" and that this arrangement was satisfactory to

3. TRUSTS: establishment: evidence.

·her. Consequently, Mrs. Bates occupied the room built and intended for Mrs. Vorse until December, 1909, and not till after the mother's injury, in 1910, did she first come into occupancy of the room built for her 10 years before. It also incidentally appears in this connection that, at about the time of the transaction in 1899, defendant's wife received conveyance from Mrs. Bates of property which he now estimates to be worth $100,000. Without indulging in any derogatory comment or inference pertaining to the showing made in these respects, it is very evident that the consideration for this deed from the mother to defendant is of the most trivial and purely nominal character. Indeed, at no point in the history of the dealings by which the entire property and estate of Mrs. Vorse were gradually acquired by the defendant, after he took charge of her affairs in 1890, is he shown to have paid or furnished her any consideration therefor, either in property or money, or in the relinquishment of any substantial right on his part, or in rendering her any service, care, or support which he was not already under legal obligations to provide.

·    II.   But mere want of valuable consideration is manifestly insufficient to invalidate the defendant's title to the property so obtained by him, or to charge him with the duty of accounting for such property for the benefit of his mother or her heirs. The property was her own, to dispose of by deed, will, sale, or gift, to any person or persons, even to the exclusion of any or all those who would appear to have any claims, natural or otherwise, upon her bounty; and if there be nothing to impeach the good faith of the transactions now under investigation except the absence of valuable consideration passing from the defendant to his mother, his title to the property is impregnable, and the decree below must be affirmed.

4. DEEDS: validity: want of valuable consideration.

But the record shows much more than the simple fact

of family relationship between the grantor and the grantee.
The defendant was his mother's sole agent and confidential
adviser. He was her only living child, and
a man of large experience in the handling
and management of property, to whom she
naturally and properly looked for help and
direction. She was a woman of advanced
age, not shown to have had business training or experience.
The evidence shows that, during the later years of her life,
she was physically disabled. We think it also shows a
progressive weakening of her mental powers; and, while
we are not prepared to say she had reached that state of
extreme deterioration rendering her incapable of making
a valid disposition of property, we think it quite clear that
her faculties were so far impaired as to render her less
capable of caring for her own interests, and more suscepti-
ble to the influence of any person in whom she reposed spe-
cial confidence. When such relation is shown to exist, it is
a thoroughly well-established principle that a presumption
of fraud or undue influence will arise whenever it appears
that the stronger or dominant party to such relation makes
any contract or has any business dealings with the other
to his own advantage or profit. *Schneider v. Schneider,* 125
Iowa 1; *Sullivan v. Kenney,* 148 Iowa 361, 377; *Curtis v.
Armagast,* 158 Iowa 507; *Cash v. Dennis,* 159 Iowa 18;
*Wahl v. Taylor,* 176 Iowa 353. In disposing of this case
below, the trial court conceded the soundness of the rule
here stated, and that the effect of it was to cast upon the de-
fendant the burden of showing the good faith of the several
dealings between him and his mother, and the absence of
undue influence on his part, but held that defendant had
overcome the burden so placed upon him, and clearly and
affirmatively established the good faith and fairness of all
said transactions.

We have examined the record with much care, and find

5. DEEDS: valid-
ity: presump-
tions: evidence:
burden of
proof.

ourselves unable to concur in that view of the evidence. Keeping in mind the proposition, which we think cannot be questioned, that the burden is upon the defendant to make an affirmative showing of good faith, it must be said that he has offered very little admissible evidence of that important fact. Indeed, with a single exception, to which we shall later refer, not one of the many transactions between defendant and his mother which are challenged in this suit appears to have taken place in the presence of witnesses, and the only testimony offered with respect thereto is that of the defendant himself. That, under the statute, he was incompetent to testify to these personal transactions with the deceased is hardly open to question. It is possible that, as to certain phases of these dealings, objection to his competency as a witness was waived by the plaintiffs; but to a great extent, his testimony was taken subject to timely and appropriate exceptions, with the result that, when the record is so pruned as to leave therein only those matters which the court has authority to consider, the lack of an affirmative showing in rebuttal of the presumption of undue influence or constructive fraud is very apparent.

6. WITNESSES: competency: transaction with deceased.

Moreover, even upon the showing made by the defendant himself, there is a traceable thread of purpose, running through the web of circumstances from the early stage of his intimate connection with his mother's business and property affairs down to the trial below, to absorb whatever she had of value, to the exclusion of his deceased brother's family, who would share therein if she died intestate, or if the will she had executed were permitted to take effect while she retained any property in her own right.

7. DEEDS: validity: undue influence: evidence.

It is not to be understood that we find that defendant had any conscious purpose or intent to defraud or impover-

ish his mother, but we cannot doubt that he did intend what he, in fact, accomplished: that is, to obtain title in himself to everything she possessed, and thereby to secure his own undivided succession to her estate. That the mother herself did not contemplate such a thing is shown by the fact that, five years after defendant became her agent and representative, she executed a will, giving to him the one half of her estate, and the other equal share to the children of Charles. Defendant received this will and held it in his possession until after this action was begun, never offering it for probate. This he excused on the theory that his mother left no estate on which the will could have any effect; although, when called upon by the son of Charles, who had been appointed administrator of her estate, he seems to have discovered a diamond ring, which he retained because his "mother wanted Ruth [his daughter] to have it," a plain gold ring, which she "wanted her grandson Charles to have," but which was still retained by defendant at the time of the trial, and some "religious tracts that she had saved up for Norman," of which, it appears, Norman waived the delivery.

Somewhat illustrative, also, of the defendant's attitude in these matters is his explanation with reference to the loans of $5,000 each which Mrs. Vorse made to himself and his brother. It appears that, for several years after defendant took charge of her business, the widow, or the widow and children, of Charles continued to pay Mrs. Vorse the accruing interest on the debt. Defendant testifies that he also paid interest on his note, but produces no voucher, endorsement, record, entry, or account of such payments. He further says that, in 1909, six years before her death, his mother took up and destroyed the note, and forgave him the debt, and at the same time handed him the note of like amount which she held against his brother or brother's widow, with instruction "to give to Norman [son of Charles] at some future time *when I should deem best.*" It was agreed

between them, he says, that the mortgage securing the debt should be canceled, so that the family of Charles could sell the property, but that "mother and I agreed the note should be held until I wanted to deliver it to him. That is because it was suggested that something might happen to me or to mother, and needed them to do something for her support." Defendant continued to hold the note until after his mother's death, and after her grandson Norman had been made administrator of her estate. The mortgage was never delivered up, though it appears to have been canceled upon the records. On cross-examination concerning his action in this respect, he testified:

"Q. You say you held that as a sort of a leverage? A. Perhaps, yes. Q. I understand, of course, very well what a lever is, and what leverage is. What was the lever, and what was it for? A. Mother and I talked it over, and she suggested there was no haste in giving it to Norman. Q. I am asking what you held it for? A. I held it so if any accident happened to me, and mother would need some more help from them, her support, it wouldn't entirely release Charles' side of the house from any obligation. Q. Just why did you hold the note from the time of your mother's death until July 27, 1915? A. No special reason,—just happened to."

This "explanation" would be more explicable if defendant had not already declared:

"I had never regarded the provisions of my father's will in reference to mother's support as being a charge on the property I received from my father's estate—always regarded it as simply being necessary for me to keep up the taxes and repairs on that house: that is, the old home."

His own conduct in charging the expenses of his mother's care and support against her individual property is entirely consistent with this manifestly erroneous view of his own obligation, and if we may assume that such was his honest understanding of the effect of the will, it lends a more

unfavorable aspect to his conduct, in that, while securing to himself an entire discharge from his own debt of $5,000, concededly without payment of a dollar of the principal, he was for six years holding back the surrender of the evidence of the like indebtedness of his decedent brother, to be used as a "leverage" for the enforcement of an obligation which he himself repudiated for his own "side of the house."

In a preceding paragraph of this opinion, we mentioned the fact that, of the numerous transactions by which the defendant acquired title to the property of Elizabeth Vorse, there was but one to which any witness other than defendant himself undertakes to testify. In the year 1910, when Elizabeth Vorse was 80 years old, she received a severe injury, which crippled her for the remainder of her life. After being treated at a hospital for about 60 days, she was removed to the home of the defendant, where a nurse was engaged to care for her. Before this injury, she had transferred to the defendant every item of her property except her interest in the coal mining lease, and possibly the diamond ring, plain gold ring, and package of religious tracts, to which reference has been made. Under these circumstances, defendant prepared a written assignment to himself of her interest in the coal lease. This she signed, and her signature was witnessed by the nurse,—a precaution which, as we have said, he never before observed. The nurse, being called as a witness for the defendant, and speaking of the circumstances attending the execution of the paper, testified as follows:

"She said she wanted me to sign it; that she was signing it over to Frank to take care of it for her, and that she did not want to bother with it. Q. That is what she said? A. Yes, sir. Q. That is all she said? A. Yes; only she said, 'I will tell you what you are signing.' She said, 'It is a lease on a coal mine in Pennsylvania. I want you to sign it. I want Frank to take care of it.' "

Later, she was recalled to the stand by defendant, to correct her answer, and did so as follows:

"A. Well, she said she wanted Frank to have that property. Wanted Frank to have what she had, and she was signing it over to him; and why I put the other to it, I must have been flustrated, because afterwards I knew I said what I hadn't ought to have said. She never said it."

It is sufficient to say of this corroboration of the defense that it is not at all convincing. The witness makes no pretense of knowledge concerning what, if anything, had passed between defendant and his mother upon this subject; and, as he admits he gave no consideration for the assignment, there seems to be an entire absence of any evidence rebutting the unfavorable presumption which the law attaches to the transaction.

Further discussion or recitation of evidence is unnecessary. As is often the case where dealings between persons in confidential relations are under inquiry, and especially where the party alleged to have been wronged is dead, it is difficult to compress into the brief statement which the paper limits of an opinion will allow, any adequate reproduction of all the testimony influencing the mind of the chancellor who must pass upon its merits. One must read the record as a whole, to get its real effect in letter and in spirit. Thus considered and weighed, it is our conclusion that the record before us not only fails to remove, but, on the contrary, serves to strengthen and confirm, the presumption that the act of Mrs. Vorse, in divesting herself of her entire estate in favor of the defendant, who stood in close confidential relation to her, was the result of undue influence on his part. There is not the slightest evidence that she felt or had any reason to feel under greater obligation, either of love or duty, to the defendant than to the family of her deceased son. She had but two children surviving her husband. One of those sons died a few years later, leav-

ing children who are the plaintiffs in this case. That she regarded these children as representatives of their father, entitled to equal consideration with the defendant at her hands, is shown by the will which she executed; and it is difficult to believe that, acting upon her own motion, she deliberately turned over her entire estate to her prosperous living son, leaving to the children of her deceased son the mockery of a will, having no more value and effect than a sheet of blank paper. To say the least, before the defendant, who was her sole agent and chief adviser, can be confirmed in a title thus acquired from her, as against the claims of her heirs, he should produce evidence of his entire good faith, other than his own insufficient testimony. The case is fairly ruled by those precedents we have already cited, as well as many others, which an examination of the books will reveal. Many of the precedents are examined, and the rule and the reasons which underlie it are quite fully considered, in *Curtis v. Armagast,* supra, and we shall not take time for their further review in this opinion. The case does not fall within the rule of *Marshall v. Marshall,* 75 Iowa 132, and others of that class, where property is conveyed in consideration of a promise of support. Here, the obligation to support the grantor was already complete and binding, and his subsequent promise or understanding would add nothing thereto.

In our opinion, the decree below must be reversed, and the defendant held to make due and proper accounting to the plaintiffs, who together are entitled, as heirs of Elizabeth Vorse, to the one half of the estate of which she died seized or possessed. Accounting will be made on the theory that the said conveyances and transfers to defendant by the deceased after the year 1890, and the moneys collected and received by him, were in trust for his mother. Of the several tracts or lots conveyed by her to him, there is now, as we understand the record, only the one men-

tioned as the "Fourteenth Street property" still left undisposed of by him, and of this he will be adjudged to hold the title to an undivided half, in trust for the plaintiffs; provided, however, that, if the parties can agree upon the value, defendant may pay into court for the plaintiffs the value of their undivided half, and in such case, the entire title will be quieted in him. For the other lots which concededly belonged to Mrs. Vorse, one lot in East Des Moines and two lots on Twentieth Street, defendant will account for the undivided one half, as of the date of their transfer to him, at the value which he himself places thereon, to wit, $300 each. He will also account for one half the income, rents, and profits received by him from the Fourteenth Street property and other property in like trust to the date of the final decree, after deducting therefrom proper charges for taxes and repairs. He will also be held to have received the assignment of the Pennsylvania coal lease in trust for his mother, and to account to the plaintiffs for one half of all the income derived by him therefrom and to re-assign to them an undivided one half of the interest which he acquired by the assignment from his mother, unless the parties can agree upon its value, and one of the parties takes it over at the agreed figure. The defendant is not to be credited or allowed deduction upon any item properly chargeable to him because of any expense incurred upon his part for the care or support of his mother. In view of the fact that the note given for the loan of $5,000 to Charles Vorse appears to have been surrendered to the plaintiffs, we think the two items of $5,000 may be treated as offsets, and disregarded in this computation. We think, also, that the several items of real estate not here described, title to which was held, for a time, by Mrs. Vorse, and later conveyed to defendant or to others at his direction, are to be treated as held by her in trust for him, and that accounting therefor will not be required in this case. The evidence showing the

trust character of this title is by no means as clear or satisfactory as could be wished, but we find that the claim of defendant has the support of some legitimate inferences from other conceded facts, and we are disposed to exclude such property from the accounting.

We do not find the testimony in the printed record sufficiently explicit to enable us to state for ourselves the account here provided for, and the cause will be remanded to the trial court for that purpose. If the court shall find it necessary, it is authorized to hear additional evidence concerning these several items; but the cause is not to be considered as standing for a new trial upon any of the issues joined, and the new or additional evidence, if any is offered, will be restricted to a determination of the proper amount of the several items which we have designated; and when they have been ascertained, decree will be entered in harmony with the views we have here expressed.—*Reversed and remanded.*

LADD, C. J., GAYNOR and STEVENS, JJ., concur.